Filed 6/20/14  In re J.R. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re J.R., a Person Coming Under the Juvenile Court Law. | B251341 consolidated with B253188 (Los Angeles County Super. Ct. No. CK38280) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. CHRISTY F., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Robert S. Draper, Judge.  Affirmed.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel and Peter Ferrera, Deputy County Counsel for Plaintiff and Respondent.

## I.  INTRODUCTION

The mother, Christy F., appeals from the July 15, 2013 order denying her Welfare and Institutions Code[1] section 388 petition.  She argues it was error to deny her modification petition without a hearing.  We conclude the juvenile court did not abuse its discretion in denying the section 388 petition.  The mother also challenges the denial of her request to continue the section 366.26 hearing and the order terminating her parental rights.  She contends the juvenile court should have applied the beneficial parent-child relationship exception instead of terminating her parental rights.  We find the denial of the continuance request was not an abuse of discretion.  In addition, we conclude the mother failed to establish regular visitation and contact with the child warranting application of the parent-child relationship exception.  We affirm the orders under review.

## II.  PROCEDURAL HISTORY

On January 8, 2010, the Los Angeles County Department of Children and Family Services (the department) filed a section 300 petition on behalf of the child, eight-year old J.R.  The petition alleged:  the mother had mental and emotional problems including paranoia and auditory and visual hallucinations which rendered her unable to provide regular care and supervision of the child; the mother placed the child in a detrimental and endangering situation by driving under the influence of methamphetamine; and the mother had a history of illicit drug abuse and was a current user of methamphetamine.  Also, the petition alleged the father, J.R., failed to provide for the child.  In addition, the petition alleged J.R.'s whereabouts was unknown.  The child was detained on January 6, 2010, with temporary placement and custody vested with the department.  The mother was granted monitored visits.  The department was ordered to provide the mother with

---

[1]  Further statutory references are to the Welfare and Institutions Code.

2

referrals for individual counseling to address mental health issues and parenting and drug education classes.

On June 18, 2010, the juvenile court found the child was a dependent under section 300, subdivisions (b) and (g). The juvenile court sustained the allegations in count b-1: "[The mother] has mental and emotional problems, including [p]aranoia and auditory and visual hallucinations which renders the mother unable to provide regular care and supervision of the child. Such mental and emotional condition on the part of the mother endangers the child's physical and emotional health and safety and places the child at risk of physical and emotional harm and damage." The juvenile court also found true the allegations in count b-3: "[The mother] has a history of illicit drug abuse and is a current user of methamphetamine which renders the mother incapable of providing regular care of the child. On 01/02/2010, the mother had a positive toxicology screen for methamphetamine. On 01/02/10, and on prior occasions, the mother was under the influence of illicit drugs while the child was in the mother's care and supervision. The mother's use of illicit drugs endangers the child's physical and emotional health and safety and creates a detrimental home environment, placing the child at risk of physical and emotional harm and damage." In addition, the juvenile court sustained counts b-4 and g-1 against the father: "[The father] has failed to provide the child with the necessities of life including food, clothing, shelter and medical care. The father's whereabouts is unknown. Such failure to provide for the child on the part of the father endangers the child's physical and emotional health and safety and places the child at risk of physical and emotional harm and damage."

The juvenile court removed the child from the mother's custody. The mother was ordered to: take all prescribed psychotropic medications; participate in counseling; and submit to eight weeks of random or on demand drug tests. If the mother missed or had a positive drug test, she was required to participate in a drug program with random testing. The mother was granted monitored visits with the child with the department having discretion to liberalize visitation. On June 18, 2010, the mother appealed the juvenile court's jurisdiction and disposition findings and orders. We affirmed the juvenile court's

jurisdiction and disposition findings and orders in an unpublished opinion on February 8, 2011. (*In re J.R.* (Feb. 8, 2011, B225377) [nonpub. opn.].)

On September 13, 2010, the juvenile court gave the department discretion to liberalize the mother's visits to unmonitored visitation after consultation with the Department of Mental Health. On December 17, 2010, the mother was allowed weekly one-hour unmonitored visits. The department was allowed discretion to further liberalize the mother's unmonitored visitation. At the contested six-month review hearing on February 15, 2011, the mother was granted eight hours of unmonitored visits on Saturdays with the possibility of overnight visits if the Saturday visits went well. The juvenile court found the mother was in compliance with the case plan.

Beginning on March 18, 2011, the mother had unmonitored overnight weekend visits with the child. But on July 19, 2011, the juvenile court terminated the mother's overnight visits. This occurred after the mother returned the child to the foster mother, Linda T., late. The mother was allowed eight hours of unmonitored visits and ordered to return the child on time. On November 18, 2011, the juvenile court ordered the mother to have monitored visits pending further order of the court. On February 29, 2012, the juvenile court terminated family reunification services for the mother. The juvenile court found the mother was not in compliance with the case plan.

On July 2, 2013, the mother filed a section 388 petition requesting weekend overnight visitation because the child was placed over 80 miles away. The mother stated she completed eight consecutive random testing and all the results were negative. In addition, the mother stated she was in compliance by receiving mental health counseling. Attached to the petition was a letter from the Endelman Westside Mental Health Center stating the mother had received case and medication management since November 19, 2010. The mother asserted the request was in the child's best interest. The mother enjoyed weekend overnight and extended week-long visits with the child before the juvenile court modified the visits to monitored visits. The modification petition concluded, "The child will be 12 years [in July], and should be given a choice of home of mother[.]"

4

On July 3, 2013, the mother's counsel filed a walk on request. The mother asked the juvenile court to order the social worker to schedule monitored visits. The mother stated she consistently called the social worker, Charles Matthews, to schedule visitation but he did not call back. On July 10, 2013, the juvenile court granted the mother unlimited visits at the maternal grandparents' home. The visits were to be monitored by the maternal grandparents through August. Thereafter, visits would be twice a month at the maternal grandparents' home.

On July 15, 2013, the juvenile court denied the mother's section 388 petition. The request was denied because the petition did not "state new evidence" or a change in circumstances. In addition, the juvenile court explained, "visitation was addressed" at the July 10, 2013 hearing. On August 28, 2013, the mother appealed the denial of the section 388 petition. The appeal from the denial of the modification petition was assigned case No. B251341.

At the section 366.26 hearing on November 26, 2013, the juvenile court denied the mother's continuance request. The juvenile court found: a continuance would not be in the child's best interest because she had waited a long time for permanency; the child was adoptable by clear and convincing evidence and there was no impediment to the adoption; and no exceptions to the adoption preference applied in this case. The juvenile court terminated parental rights and designated Linda T. as the prospective adoptive parent. The mother appealed the order terminating her parental rights on December 5, 2013 and was assigned case No. B253188. On March 4, 2014, the two appeals in case Nos. B253188 and B251341 were consolidated.

III. EVIDENCE

A. Detention Report

On January 2, 2010, the department received a referral alleging the mother emotionally abused the child. Children's social worker Eleanor Clements went to the

Ronald Reagan Medical Center emergency room at the University of California at Los Angeles. Ms. Clements spoke with two physicians, Dr. Amer Mock and Dr. Mike Getz. The doctors stated the mother's paranoia and visual hallucinations were related to her amphetamine abuse. A nurse informed Ms. Clements the mother tested positive for methamphetamines. Ms. Clements interviewed the mother but she was a poor historian because of her auditory and visual hallucinations. However, the mother denied she had visual and auditory hallucinations. The mother stated the father brought vermin into her house and they were constantly multiplying and changing shapes. She stated the father kept following her. She heard him and his friends "talking" all the time. She accused the father and his friends of breaking her stuff, running up her gas and water bills and stealing her mail. The mother denied using methamphetamines but admitted she was around "some stuff" at Christmas. The mother admitted she had used marijuana before. The mother stated she and the child were at the Ronald Reagan Medical Center because the youngster had liver problems. The child was later examined by a physician, identified only as Dr. Corn, at Children's Hospital of Los Angeles. According to the detention report, the examination was performed to clear the child for foster care. Dr. Corn stated the child had no physical illness or disease.

## B. Jurisdiction And Disposition Report

The February 3, 2010 jurisdiction and disposition report was prepared by the children's social worker, Mr. Matthews. The report states the child resided with the foster parent, Linda T., in a four-bedroom, two-bath home in Long Beach. The child shared a bedroom with Linda's nine-year-old adopted daughter. The mother called most days to speak with the child. But the mother had not been in contact with Mr. Matthews since January 21, 2010.

Mr. Matthews indicated the maternal grandparents adopted the mother when she was 12 years old. The mother enjoyed a pleasant upbringing after adoption. But when the mother became a teenager, she became headstrong and defiant, refusing to follow the

6

house rules. She had a son, D.F., when she was 17 years old. D.F. became a dependent of the court in 1999 after he was hospitalized because of an upper arm fracture. In April 2001, D.F. suffered bruises on his face and scratches and bruises on his neck, back and torso while in the mother's care. On May 21, 2001, the juvenile court ordered suitable placement for D.F. and permanent placement services. D.F.'s case was closed on November 5, 2004.

C. 2010-2012 Review Reports And Last Minute Information for the Court Documents

The March 2, 2010 addendum report stated the mother appeared determined to regain custody of the child. The mother claimed to be visiting the child every week in Long Beach. But the June 18, 2010 interim review report stated the mother had not visited the child since February 16, 2010. The maternal grandparents reported they had not seen the mother for several months.

The September 13, 2010 interim review report stated the child was doing very well at school and home since being placed with Linda. The mother was visiting the child weekly at the maternal grandfather's church on Sundays. The mother's random drug tests were all negative.

The December 17, 2010 status review report stated the child remained in Linda's home. The child got along well with all members of the foster family. The child reported she loved Linda and was very happy to stay in the foster home. The child saw the mother for monitored visits at church on Sundays. The visits occurred when the child stayed at the maternal grandparents' home in Walnut during weekends. The child expressed mixed emotions. On one hand, the child loved the mother. Yet the child also felt very close to Linda.

The May 24, 2011 interim review report stated the child remained in Linda's home. The child loved living with Linda. But the child also loved going to her mother's home and spending weekends there. The child reported visiting her older brother, D.F., in Fontana. She enjoyed getting to know her older brother better and growing closer to

him.  In addition, the child and the mother visited water parks, museums and parks together.  The child also went to the maternal grandfather's church on Sundays with the mother.  On some weekends the mother took the child to the grandparents' house.   The child spent spring break at her grandparents' house and had a great time.  She reported the whole family was together for Easter which made her very happy.  The mother reported picking up the child on weekends and spending time with the youngster.  The mother drove 72 miles to Fontana so her two children could spend time together.

The June 1, 2011 last minute information for the court document indicated the mother tried to receive welfare benefits for the child.  A Department of Public Social Services employee told Mr. Matthews the mother was in the office seeking welfare benefits for the child.  Mr. Matthews wrote that the welfare worker stated, "[The mother] explained that [the child] had been visiting her and she decided not to take [the child] back to the foster home."  Mr. Matthews contacted the foster mother, Linda, who said the child was at home.  The foster mother reported the child no longer want to go with the mother for weekend visits.  This was because the mother was acting bizarre.

On July 15, 2011, the department filed a section 388 petition.  The petition sought termination of the mother's unmonitored weekend overnight visits with the child.  The modification petition alleged the mother failed to return the child to Linda's residence on July 10, 2011, after a weekend overnight visit.  The next day, Mr. Matthews received a call from the Los Angeles Office of the Department of Public Social Services.  The mother brought the child into the office to apply for aid.  The child was taken into the custody of the Los Angeles County Sheriff's Department and returned to Linda's care on July 11, 2011.  Mr. Matthews noted this was the second time the mother had attempted to obtain welfare for the child.  Mr. Matthews wrote:  "Mother's behavior in the last few weeks has become very bizarre.  Mother seems to feel the court has returned [the child] to her care and custody.  The court has not done this, and mother is not following court orders as to when to return the child from weekend visits."  On July 19, 2011, the juvenile court terminated the overnight visits after construing the section 388 petition as a section 385 motion.

The September 22, 2011 status review report indicated the mother visited the child weekly on Saturdays and at church on Sundays. The child expressed mixed emotions about being returned to the mother's home. The child loved Linda but also was very close to the mother. The child reported seeing her maternal grandparents bi-monthly at their home. Mr. Matthews stated since May 2011, the mother had been "through" three therapists in two different clinics. The mother refused to sign release of information forms so Mr. Matthews could obtain information from her therapists. Mr. Matthews recommended termination of family reunification services for the mother.

On November 14, 2011, the department requested a protective custody warrant be issued for the child. The mother failed to return the child to Linda's home following a visit. Mr. Matthews made a home visit to the mother's home but neither the mother nor the child was present. Mr. Matthews and Linda contacted the maternal grandparents who stated the mother and child did not come to church the past Sunday. Mr. Matthews noted this was the second time the mother failed to return the child to foster care after a visit. On November 18, 2011, the warrant request was taken off calendar because the mother appeared with the child in juvenile court. The mother's unmonitored visits were modified to monitored visits pending further order of the juvenile court.

The December 28, 2011 last minute information for the court document reported the mother had missed several appointments with her clinical social worker, Steve Artiga, over the past month. Mr. Artiga said the mother stated she missed the most recent appointment due to "'incarceration.'" Mr. Artiga suspected the mother had not been compliant with her medication because she was more tangential in her thoughts at her last meeting with him. Mr. Matthews reported the mother was arrested on a felony charge on November 28, 2011 and released the next day. There were no details provided concerning the felony charge.

On February 29, 2012, Mr. Matthews reported the mother's arrest was drug-related and the felony charge remained outstanding. Mr. Matthews indicated Mr. Artiga was no longer the mother's therapist. The mother continued to refuse to consent to release of information about her medication. When the mother came to pick up her bus

pass at the department office on February 1, 2012, Mr. Matthews was contacted because her appearance and affect were of concern. When Mr. Matthews spoke to the mother, he could not understand her. He was unable to ask the mother questions about counseling, visitation, the signing of release of information forms or her felony arrest. The child had no seen her mother since Christmas. From December 2011 to June 2012, the mother did not visit the child. On June 17, 2012, the mother appeared at Linda's church in Long Beach and demanded to see the child. The mother called the Long Beach police and claimed Linda had stolen the child.

The August 29, 2012 status report stated Linda had moved from Long Beach to Victorville in San Bernardino County. The child said she liked her new home. The child reported she continued to visit the maternal grandparents by attending day trips, church, and movies with them. The child saw the mother at church when staying with the maternal grandparents on most Sundays. The mother usually came to the grandparents' home for dinner after church. Mr. Matthews wrote: "The [child] reports a loving circle including grandparents and friends who are helping guide her way. The [child] states she sees her mother at church and feels she has the best of both words in that she is able to spend time with her mother and grandparents." The child expressed a strong desire to remain in Linda's home. According to Mr. Matthews, "The [child] states she loves her mother but is not sure her mother can care for her at this time." The foster care agency reported the child was informed of possible adoption by Linda. The child was happy about it. The foster care worker, Joyce Roberts, noted the child had formed a strong bond with Linda and other foster family members.

D. September 28, 2012 Section 366.26 Report

The section 366.26 report, filed on September 28, 2012, stated: the child wanted Linda to adopt her; Linda had adopted two grandnieces in 2009 who resided with her; the child got along very well with the grand nieces and they called each other "sisters"; the child was happy, felt very loved and secure residing with Linda; the child continued to

10

see the mother at church on Sundays during twice monthly visits with the maternal grandparents; the child spent 3-4 weeks over summer vacation with her maternal grandparents; and the child saw the mother at church on Sundays when the youngster was with her maternal grandparents. Mr. Matthews indicated on September 20, 2012, the mother came into the department's office "acting very strange." The mother declined any mental health services. Mr. Matthews wrote, "[The m]other admitted she is not taking her medication nor is she seeing her doctor."

E. 2013 Review Reports And Last Information For The Court Documents

Mr. Matthews stated in his February 27, 2013 status review report: "[The child] informed [me] she wishes to be adopted by [Linda]. [The child] states it has been too long a period of time for her mother to get her back and she wishes to remain in her current home with [Linda]. [The child] states she wants her mother to get well and become healthy again." The child reported seeing the mother at the maternal grandparents' home over the holidays. The child stated she had not seen or heard from the mother prior to the holidays.

The child had resided in Linda's home for the past three years since January 3, 2010 and continued to thrive in the residence. Linda remained interested in adopting the child. Linda completed all the adoption paperwork and her home study was approved on January 16, 2013. Linda loved the child very much and wanted to provide the youngster with a permanent, stable and loving home through adoption. The May 16, 2013 last minute information for the court document stated the child last saw the mother on Easter Sunday at church. The child reported visiting with the mother on Christmas and New Year's Day.

The August 28, 2013 status review report stated the child stayed with her maternal grandparents during her summer break from June 5 to August 5, 2013. The child reported seeing the mother at the maternal grandfather's church on Sundays. This occurred while the child was staying with her maternal grandparents. The child had not

11

seen the mother since Easter Sunday. The child reiterated her desire for the adoption process to move forward. The child explained she wanted adoption to be completed. This would permit Linda to make the decision to allow the child to sleep over at a friend's house. Mr. Matthews indicated the mother failed to pick up money for her train ticket to visit the child in Rancho Cucamonga. The mother did not appear for her scheduled visit with the child on August 13, 2013.

### F. August 28, 2013 Section 366.26 Report

The August 28, 2013 section 366.26 report stated the child spent her summer vacation with the maternal grandparents. The child reported continuing to see the mother at church on Sundays while visiting the maternal grandparents during the summer. The child continued to want to be adopted by Linda. Mr. Matthews recommended parental rights be terminated with adoption as the permanent plan.

On September 9, 2013, the child's attorney requested continuance of the section 366.26 hearing. The child's attorney explained the child did not want to go forward with adoption but expressed interest in a guardianship. But the November 26, 2013 last minute information for the court document stated the child now wanted adoption rather than legal guardianship. Mr. Matthews wrote: "[I] and [the child] discussed her wishes regarding adoption or legal guardianship[.] The [child] told [me] she wants to be adopted by [Linda] to become her daughter in the eyes of the law. [The child] states she wants [Linda] to be able to make decisions for her as her adopted mother. [The child] wants [me] to express to the court her feelings that she now wants to be adopted by [Linda], her current caregiver."

### G. Contested Section 366.26 Hearing

At the November 26, 2013 contested section 366.26 hearing, the child's attorney spoke with the youngster. According to the child's lawyer, the youngster still wanted to

12

be adopted. The department's counsel stated Linda was not interested in legal guardianship of the child. Mr. Matthews, the social worker, stated the maternal grandparents were unwilling to split transportation of the child with Linda. Mr. Matthews had tried to facilitate the mother's visits by paying for her transportation so she could visit in Rancho Cucamonga. But twice, the mother failed to go to her scheduled visit with the child. The mother's counsel, Victor Ozoude, responded the mother did not show up because she was unable to contact Mr. Matthews. None of this dialogue was presented under oath.

The child was called to testify by the mother. The child testified to spending time with the mother during unmonitored and overnight visits since the detention hearing. The child testified the mother took very good care of her during those visits. The child stated Mr. Matthews explained to her the difference between adoption and legal guardianship. The child understood the mother did not have the right to visit her if adoption was the permanent plan. But the child testified she was "not okay" with that scenario. The child last saw the mother in July during a visit with the maternal grandparents. The child has requested additional visits from Mr. Matthews but he had not called her back about the visits.

## IV. DISCUSSION

### A. Section 388 Petition

Section 388, subdivision (a)(1) states in part: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court." A parent requesting modification under section 388 has the burden of proving by a preponderance of the evidence that the child's welfare requires such change. (Cal. Rules of Court, rule 5.570, subd. (h)(1)(C); *In*

*re A.A.* (2012) 203 Cal.App.4th 597, 612; *In re B.D.* (2008) 159 Cal.App.4th 1218, 1228.)  The parent must show changed, not changing, circumstances.  (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615; *In re Casey D.* (1999) 70 Cal.App.4th 38, 47.)  In addition, new evidence or change in circumstances must be of such significant nature that it requires modification of the challenged order.  (*In re A.A., supra,* 203 Cal.App.4th at p. 612; *In re Mickel O., supra,* 197 Cal.App.4th at p. 615.)  We review an order denying a petition under section 388 for an abuse of discretion.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318; *In re A.A., supra,* 203 Cal.App.4th at p. 612.)

The mother argues the juvenile court erred in denying her section 388 petition without a hearing.  She contends the juvenile court mistakenly believed Mr. Ozoude's walk on request to enforce visitation collaterally estopped her from a hearing on her section 388 petition.  The mother argues she sufficiently pleaded changed circumstances and the child's best interest to warrant a hearing on her section 388 petition.

In support of her section 388 petition, the mother submitted a letter from the Endelman Westside Mental Health Center.  The letter stated the mother has received case and medication management from the mental health center since November 19, 2010.  But the letter does not establish a change in circumstances.

Moreover, the juvenile court, without abusing its discretion could find the child's best interests would not be served by granting the modification petition.  There is ample uncontradicted evidence the mother was not in compliance with juvenile court orders requiring her to take medication and attend counseling.  Beginning on March 18, 2011, the mother had unmonitored overnight weekend visits with the child.  On May 27, 2011, the mother attempted to obtain welfare benefits for the youngster even though the child resided with Linda, the foster mother.  On this occasion, the mother was acting bizarrely.  On July 10, 2011, the mother failed to return the child to Linda after a weekend overnight visit.  The child was taken into custody and returned to Linda the next day after the mother again attempted to obtain benefits for the child.  Putting aside the issue of welfare fraud, the mother claimed she had regained custody pursuant to a juvenile court order

14

when nothing of the sort had occurred. Mr. Matthews stated the mother's behavior in the last few weeks had become "very bizarre."

On July 19, 2011 the juvenile court terminated the weekend overnight visits after the mother was late in returning the child to Linda's home. In the September 22, 2011 status report, Mr. Matthews stated the mother refused to sign release of information forms so he could obtain information from her therapists. On November 12, 2011, the mother again failed to return the child to Linda's home following a visit. The mother appeared with the child in juvenile court on November 18, 2011. At that hearing, the juvenile court modified the unmonitored visitation order to permit only monitored visits.

On November 28, 2011, the mother was arrested on a felony drug charge. The mother's clinical social worker, Mr. Artiga, said she had missed several appointments in November. Mr. Artiga reported the mother stated she missed the most recent appointment due to "'incarceration.'" Mr. Artiga suspected the mother had not been compliant with her medication because she was more tangential in her thoughts at her last meeting with him. Mr. Matthews reported Mr. Artiga was no longer the mother's therapist in February 2012. The mother continued to refuse to consent to release of information about her medication. When the mother came to pick up her bus pass at the department's office on February 1, 2012, Mr. Matthews was contacted because her appearance and affect were of concern. Mr. Matthews could not understand the mother during his conversation with her. In addition, he was unable to ask the mother questions about counseling, visitation, the signing of release of information forms or her arrest.

The mother acknowledges she was not participating in services, did not take her medication and was not seeing a physician in 2012. From December 2011 to June 2012, the mother did not visit the child. But on June 17, 2012, the mother appeared at Linda's church in Long Beach and demanded to see the child. The mother called the Long Beach police and falsely claimed Linda had stolen the child. On September 20, 2012, the mother came into the department's office "acting very strange." The mother admitted she was not taking her medication or seeing her doctor but declined any mental health services.

15

In the February 27, 2013 status review report, the child reported seeing the mother over the holidays at the maternal grandparents' home. The child saw the mother on Christmas and New Year's Day. But the child did not see or hear from the mother before the holidays. The May 16, 2013 last minute information for the court document stated the next time child saw the mother was on Easter Sunday. The child did not see the mother again until June 2013. During that time, the child saw the mother on Sundays at the maternal grandfather's church. Given the foregoing evidence, it was not an abuse of discretion for the juvenile court to deny the modification petition. In all respects, the juvenile court's determinations are supported by substantial evidence. There were no material changed circumstances nor was it in the child's best interests for a hearing to be held on the modification petition's merits.

## B. Continuance of Section 366.26 Hearing

The mother argues the trial court abused its direction in denying her November 26, 2013 continuance request. Under section 352, subdivision (a), no continuance shall be granted that is contrary to the interest of the child. Section 352, subdivision (a) states in part: "In considering the minor's interests, the court shall give substantial weight to the minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements. [¶] Continuances shall be granted only upon a showing of good cause and only for that period of time shown to be necessary by the evidence presented at the hearing on the motion for continuance." We review the juvenile court's denial of a continuance request for abuse of discretion. (*In re Mary B.* (2013) 218 Cal.App.4th 1474, 1481; *In re Giovanni F.* (2010) 18 Cal.App.4th 594, 604; *In re Elijah V.* (2005) 127 Cal.App.4th 576, 585.)

Given the applicable deferential standard of review, the mother's contention that the juvenile court erred in denying the continuance is meritless. The juvenile court ruled the November 26, 2013 continuance was not in the child's best interest. The child has

16

been a dependent of the court since June 2010. The child was now 12 years old and wanted to be adopted by Linda. The child has been residing with Linda since January 3, 2010. Linda loved the child and wanted to provide the youngster with a permanent, stable and loving home through adoption. Linda's adoptive home study had been approved in January 2013. The child thrived in Linda's home and felt happy, loved and secure living with the prospective adoptive family. The child got along very well with Linda's two adopted grand nieces and they called each other "sisters." The child's best interest was promoted by proceeding with the section 366.26 hearing. The juvenile court did not abuse its discretion in denying the mother's continuance motion.

## C. Parent-Child Relationship Exception

At a section 366.26 hearing, the juvenile court selects and implements a permanent plan for the dependent child. (*In re Celine R.* (2003) 31 Cal.4th 45, 52-53; *In re Marilyn H.* (1993) 5 Cal.4th 295, 307.) Our Supreme Court has summarized the juvenile court's options at the section 366.26 hearing: "In order of preference the choices are: (1) terminate parental rights and order that the child be placed for adoption (the choice the court made here); (2) identify adoption as the permanent placement goal and require efforts to locate an appropriate adoptive family; (3) appoint a legal guardian; or (4) order long-term foster care. (§ 366.26, subd. (b).) Whenever the court finds 'that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption.' (§ 366.26, subd. (c)(1).)" (*In re Celine R., supra,* 31 Cal.4th at p. 53; *In re Hector A.* (2005) 125 Cal.App.4th 783, 790-791.)

One exception to adoption is the parent-child relationship exception. This exception is set forth in section 366.26, subdivision (c)(1)(B)(i) which states: "[T]he court shall terminate parental rights unless either of the following applies: . . . [¶] (B) The court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would

17

benefit from continuing the relationship." (*In re K.P.* (2012) 203 Cal.App.4th 614, 621-622.)  The mother has the burden of proving the relationship with child outweighs the well-being gained by a permanent home with adoptive parents.  (*Id.* at p. 621; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)  Evidence of frequent and loving contact is not enough to establish a beneficial parental relationship.  (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1315-1316; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418.)  The parent also must show a parental relationship exists with the child.  (*In re K.P., supra,* 203 Cal.App.4th at p. 621; *In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108.)

Appellate courts have adopted differing standards of review for the parental relationship exception determination.  Most courts review the parental relationship exception determinations for substantial evidence.  (*In re K.P., supra,* 203 Cal.App.4th at p. 621; *In re Autumn H., supra,* 27 Cal.App.4th at p. 575.)  One court has applied an abuse of discretion standard of review.  (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351; see *In re K.P., supra,* 203 Cal.App.4th at p. 621.)  More recently, two courts have adopted both the substantial evidence and abuse of discretion standards of review.  (*In re K.P., supra,* 203 Cal.App.4th at pp. 621-622; *In re Bailey J., supra,* 189 Cal.App.4th at pp. 1314-1315.)  In evaluating the juvenile court's determination as to the existence of a beneficial parental relationship, these two courts review for substantial evidence.  (*In re K.P., supra,* 203 Cal.App.4th at pp. 622; *In re Bailey J., supra,* 189 Cal.App.4th at p. 1314.)  But whether termination of the parental relationship would be detrimental to the child as weighed against the benefits of adoption is reviewed for abuse of discretion.  (*In re K.P., supra,* 203 Cal.App.4th at p. 622; *In re Bailey J., supra,* 189 Cal.App.4th at p. 1315.)  No error occurred under any of these standards of review.

The mother argues it was error to terminate her parental rights because the beneficial parent-child relationship exception applied under section 366.26, subdivision (c)(1)(B)(i).  The mother argues:  there was regular and consistent visits with the child under the circumstances; they shared a positive, strong and beneficial relationship; and she occupied a parental role.  These contentions are meritless when viewed under any potential standard of appellate review.

18

Under the first prong of the parent-child relationship exception, the mother had the burden of proving regular and consistent visitation. (§ 366.26, subd. (c)(1)(B)(i).) Under any standard of appellate review, the mother did not meet her burden. In January 2010, the mother called the youngster most days and visited after the child was detained. But from February to June 2010, the mother admitted never visiting the child. In September 2010, Mr. Matthews reported the mother was again visiting the child at the maternal grandfather's church. In March 2011, the mother was granted unmonitored visits. But the visits became monitored in November 2011 after the mother failed to return the child back to Linda. From December 2011 to June 2012, the mother did not visit the child. On June 17, 2012, the mother appeared at Linda's church and demanded to see the child. The mother called the police and falsely claimed Linda had stolen the child. By August 2012, the mother was visiting the child again on Sundays at church when the child visited the maternal grandparents twice monthly.

But in February 2013, the child was interviewed by Mr. Matthews. The child had not seen or heard from the mother since before the holidays. The child reported visiting with the mother on Christmas and New Year's Day. The next time the child saw the mother was on Easter Sunday. The mother did not visit again until the summer. The child reported seeing the mother on Sundays while staying with the maternal grandparents from June 5 to August 2013. But on July 10, 2013, the juvenile court had granted the mother unlimited visits at the maternal grandparents' home through August 2013. The mother complains visitation was difficult after the child moved to San Bernardino County in the summer of 2012. However, the mother did not visit more frequently at the maternal grandparents' home when she was permitted unlimited visits in July 2013. The mother failed to show regular visitation and contact given her irregular visits. This irregular visitation occurred throughout the nearly four years that the child was in foster care. Substantial evidence supports the juvenile court's finding that the parent-child relationship exception was inapplicable.

## V. DISPOSITION

The orders denying the mother's section 388 petition and terminating parental rights are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

TURNER, P.J.

We concur:

KRIEGLER, J.

MINK, J.[*]

_____

[*]     Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

20